Louis Rubino v. Commissioner. Catherine Rubino v. Commissioner.
Rubino v. Commissioner
Docket Nos. 16667, 16668.
United States Tax Court
1949 Tax Ct. Memo LEXIS 3; 8 T.C.M. (CCH) 1095; T.C.M. (RIA) 49288; December 28, 1949
*3 Upon the facts, held, petitioners held the property involved primarily for sale to customers in the ordinary course of their business and, hence, are not entitled to treat the profits from the sale of such property as capital gain under section 117, Internal Revenue Code. Frank C. Scott, C.P.A., P.O. Box 1904, Stockton, Calif., for the petitions. Charles W. Nyquist, Esq., for the respondent. *4 HILL
Memorandum Findings of Fact and Opinion The respondent determined deficiencies as follows: Income and
Year
victory tax
Louis Rubino
1943
$1,651.77
Catherine Rubino
1943
1,683.65
The proceedings were consolidated for trial at the hearing. Certain adjustments made by respondent are not contested. By virtue of adjustments made to petitioners' accruals for state income taxes, a refund is claimed in the amount of $23.43 in the case of Louis Rubino and $23.40 in the case of Catherine Rubino. Although the adjustments affect income for both 1942 and 1943, only the latter year is involved due to the forgiveness features of the Current Tax Payment Act of 1943. Three questions are presented for consideration: (1) Are the gains realized by petitioners from the sales in 1943 of certain dwelling houses constructed by petitioners in 1942 and 1943 taxable as ordinary income or as capital gains within the meaning of section 117 (j), Internal Revenue Code? (2) Did respondent properly include in petitioners' taxable income for 1943 the face value of a note secured by a second deed of trust which had been received as *5 part of the purchase price of a house sold by petitioners in 1943? (3) Are certain taxes imposed upon the petitioners under the personal income tax law of California deductible in determining petitioners' victory tax net income for the calendar year 1943? Findings of Fact Part of the facts were stipulated and they are so found. The petitioners are husband and wife residing at Stockton, California. They filed separate tax returns for the years involved on the community property basis with the collector of internal revenue for the first district of California. Petitioners' returns for 1942 were filed on April 15, 1943, under an extension of time granted by the respondent. During all of the years material to this proceeding the petitioners kept their books and filed their returns on the accrual basis. Petitioner, Louis Rubino, will hereafter be referred to as petitioner. Issue 1. During the years involved petitioner owned and operated the Alpine Mill & Lumber Company and was also engaged in the business of ranching and building homes for sale. In order to obtain materials needed for the building of houses, petitioner filed with the Office of Production Management in February *6 1942 on application for priorities for materials to be used in the construction of 49 dwellings houses and another application for priorities for materials to be used in the construction of 13 dwelling houses. Both applications were approved on April 7, 1942. In the applications petitioner stated that the proposed total monthly rental to be charged per dwelling unit was $50. During the war years the National Housing Agency issued certain general orders, one of which included "III. National Housing Agency General Orders, Part 702, Title 24, Code of Federal Regulations." Section 5 of that order provided as follows: "Section 5 Disposition of Private War Housing " .01 Private war housing begun on or after February 10, 1943, shall be held for rental only to eligible war workers for the duration of the national emergency declared by the President on September 8, 1939, and, except for involuntary transfers, shall be disposed of only as follows: "a. An occupant, after two months' occupancy, may purchase the private war housing unit occupied by him subject to NHA General Order No. 60-3. "b. A person who will not himself occupy such housing may purchase or otherwise acquire such housing *7 at any time, in accordance with NHA General Order No. 60-3, provided the occupancy and disposition limitations applicable to such housing prior to such purchase or acquisition shall continue to be applicable to such housing after such purchase or acquisition, or "c. At any time subsequent to 60 days after completion of any such housing, the owner of such housing may petition the National Housing Agency, in accordance with NHA General Order No. 60-3, to permit such housing to be disposed of otherwise than as provided above in this sub-section 5.01." The fair average useful life of the dwellings rented by petitioner in 1943 was 30 years. The petitioners in their 1943 income tax returns deducted depreciation amounting to $2,141.15 in total on 30 of such dwellings which had been rented during 1943 and which were being rented at the end of that year. The deduction was not changed or adjusted by the respondent on audit of the returns. The petitioners did not deduct in their income tax returns for 1942 and 1943 any amount for the depreciation of 10 dwellings which were sold during 1943 and which had been rented on an oral lease month-to-month basis. All of petitioner's houses which he *8 rented were rented on that basis. In addition, due to the shortage of housing, most of the homes which petitioner rented were rented prior to completion. The depreciation allowable on the 10 dwellings amounts in total to $110.83 for the year 1942 and to $735.75 for the year 1943. During the taxable year 1943 petitioner sold 33 dwellings. On their 1943 returns the petitioners showed the reported gains on 23 of such dwellings as short-term capital gains and on 10 of the dwellings as long-term capital gains. Of these 10 houses, three were constructed or completed in 1942, three in February 1943, and four in March 1943. The gross sales price of the 10 dwellings and the lots on which they were located was $53,465 and the realized gain by the petitioners, after adjusting for the allowable depreciation of $110.83 and $735.75 for the taxable years 1942 and 1943, respectively, as set forth in the above paragraph, was $17,164.11. In 1944 petitioner sold 27 houses, 1 of which had been constructed in 1941, 1 in 1942, 15 in 1943, and 10 in 1944. During 1945 he sold 4 homes that were constructed in 1943. The sales and rentals of the houses owned by petitioner in 1943 were handled by real estate *9 brokers. Petitioner previously had constructed and held homes for sale in 1940 and 1941. For the year 1943 petitioner's receipts from the rental of real estate were $15,108.28, and after deduction of depreciation of $2,141.15 his rental income was $12,967.13 before deductions for interest on mortgages, taxes, maintenance, overhead, real estate agents' commissions, etc. His profit on real estate sold during the same year was $35,458.25 after deduction of both direct and indirect costs. In the "Explanation of Adjustments" concerning the property which petitioner sold in 1943 the receipts from which petitioner has treated as taxable as capital gains, respondent stated as follows: "During the taxable year 1943 you sold thirty-three houses of which three were constructed by you during the last six months of 1942 and the remaining thirty during 1943. Since these transactions were frequent and continuous, it is considered that these houses are properly held for sale to customers in the ordinary course of your business. Accordingly, the profit realized on such sales is taxable as ordinary income." The dwelling units involved, together with the lots, were held by petitioner primarily *10 for sale to customers in the ordinary course of his business. Issue 2. On or about October 11, 1943, petitioner sold on a deferred payment plan one of the ten dwellings which he sold in that year located on East Alpine Street, Stockton, California, together with the lot, to its occupant at a price of $5,795 on the following terms of payment: Cash
$ 764.68
First deed of trust assumed
4,024.48
Second deed of trust
1,185.84
$5,975.00
The above sale did not qualify as an installment sale within section 44 (b) of the Internal Revenue Code, because the initial payment exceeded 30 per cent of the selling price. The initial payment was $1,950.52 ($764.68 cash and $1,185.84, the value of the second deed of trust.) During 1943 and subsequent to sale of the dwelling the purchaser paid in reduction of the note secured by the second deed of trust $585.84 which such was included by petitioners in their 1943 income tax returns as realized gain on that sale. Petitioners did not include the remaining $600 owing on that note on the ground that the second deed of trust had no fair market value at the time of purchase or sale of the house and lot or *11 any time during the year 1943. The other dwellings and lots sold qualified as installment sales within section 44 (b) of the Code, the initial payment in each instance not exceeding 30 per cent of the selling price. Under "Explanation of Adjustments" attached to the notice of deficiency respondent stated as follows concerning this transaction: "In the absence of evidence to the contrary, it is held that the second deed of trust in the amount of $1,185.84, received by you in 1943 as a part of the selling price of the piece of real estate, is to be considered the equivalent of cash. "In view of the above income from the sale of real estate is increased by $600.00 as shown below: Profit from sale of property at 26
West Alpine Street
$2,617.63
Amount reported
2,017.63
Additional gain
$ 600.00"
The note secured by the second deed of trust had a fair market value at the time of sale of $1,185.84. Issue 3. The amounts of California income taxes accruable for the years 1942 and 1943 after adjustments of net income are $154.53 for each petitioner for 1942 and $145.32 for each petitioner for 1943. Petitioner did not deduct any amount for state income taxes *12 accruble in computing their victory tax net income for the period in question. Opinion HILL, Judge: The respondent determined that the property involved was held by petitioner primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 117 (j) (1) [1] of the Internal Revenue Code, and that consequently the profit from the sale of that property is taxable as ordinary income. Petitioner, on the other hand, argues that that property was held primarily for rental purposes and that the gains from the sale of the 10 dwelling units during the years involved were properly treated as long-term capital gains in his tax return. We believe that respondent's determination must be sustained. *13 Petitioner, in his income tax return for 1942, gave his occupation as "Owner-Alpine Planing Mill; Contractor and Builder," and in the same return he stated as follows: "During 1942 taxpayer engaged in building homes for sale and on contract. In addition taxpayer had under construction 53 homes as of December 31, 1942. These homes remained unsold as of close of year. Materials, millwork and sub-contracts capitalized at cost, without taking into consideration usual mark up. Profits on houses built for sale are reported when sold, and it has not been customary to capitalize any anticipated mark up due to increasing values." (Italics supplied). Three of the ten dwelling units involved were completed in 1942. Of course the fact that petitioner was building homes for sale is not controlling if it can be shown by convincing evidence that such homes were converted to rental properties and that they were held primarily for that purpose at the time of sale. See Carl Marks, Inc., 12 T.C. 1196. We think, however, that the record affirmatively shows that not only were the homes in question built by petitioner for sale, but that he continued to hold them for that purpose. In *14 the year involved he sold 33 of the 62 houses constructed during 1942 and 1943. He sold 27 additional homes in 1944 and 4 more in 1945. His profits from sales of homes during 1943 far exceed his net income from rentals. In addition, petitioner's testimony at the hearing indicates strongly that he did not consider the rental of homes any significant part of his business activities. He stated on direct examination as follows: "Q. And your occupation, what was your occupation in 1942 and 1943? "A. I have the Alpine Mill and Lumber Company, owner and manager at the time. "Q. Any other businesses at that time? "A. Yes, ranching and building homes." It would seem, if he was holding the dwelling units involved primarily for rental purposes, that he would have mentioned a rental business in that recitation. Another factor in support of our conclusion is the method used by petitioner in renting the homes in question. As we have pointed out in our findings, most of the homes which petitioner constructed were rented prior to completion. This was due to the shortage of dwellings in this area at the time. It would seem under these conditions that if petitioner had been in the business *15 of renting homes he would have leased them for reasonably long periods of time. Petitioner, however, rented those dwellings on oral leases on a month-to-month basis. Certainly this fact is strong evidence that he wished to keep his property easily available for sale, or, in other words, that he was holding it primarily to sell. We have found as a fact, therefore, on the basis of the above, that the homes in question were held primarily for sale and only incidently to rent. Hence, we conclude after careful consideration of all the arguments and cases cited by petitioner that the profits from the sales of the property involved are taxable as ordinary income, not as capital gains under section 117. Neils Schultz, 44 B.T.A. 146, Charles H. Black, Sr., 45 B.T.A. 204, and Walter G. Moreley, 8 T.C. 904. Petitioner attempts to minimize the statement contained in his tax return that the homes in question were built "for sale" by saying it was "obviously the accountant's comments rather than a declaration by Mr. Rubino." We assume, however, that a person of petitioner's apparent business acumen would express his intention with respect to the homes *16 in question to the accountant who made out his returns. At least he did not attempt to explain that statement in the return at the hearing. Certainly there must have been some discussion between him and his accountant concerning the status of these homes. We believe that contention is not sound. Petitioner relies strongly on the regulations of the National Housing Agency in support of his contention that the property involved was held primarily for rental. He has set forth these regulations in his brief. Although he does not point out specifically which section he relies upon, we assume it is that which we have set forth in our findings. He states at one point on brief that these regulations "would put any possible and accomplished transactions outside of any sales to customers in the ordinary course of business." He also states that the respondent's determination implies that the statements which he made concerning the restrictions on sales of homes "were not made in good faith but were in effect fraudulent means of getting material for building houses primarily for sale." It will be noted that section 5 of the regulations set forth in our findings provides that "Private war housing *17 begun on or after February 10, 1943, shall be held for rental only * * *." Petitioner has submitted no proof whatsoever that the homes in question were begun after that date. In fact, as to three of these houses, he could not, for they were constructed or completed in 1942. The last of the ten in question were completed in March 1943 which is strong indication that they had their beginning prior to February 10, 1943. It thus appears that the particular provision which we assume he seeks to invoke has no application. At least he has not carried his burden that it was applicable. Even assuming, however, that these regulations affected the dwellings in question the fact remains that during 1943 petitioner sold 33 homes, or over half of the homes which he built under priorities granted by the National Housing Agency and that his income from sales of those homes far exceeded his return from rentals. In addition, it should be pointed out that the regulations in question provided that "An occupant, after two months' occupancy, may purchase the private war housing unit occupied by him subject to NHA General Order No. 60-3." Moreover, the regulations quoted by petitioner provide that *18 "At any time subsequent to 60 days after completion of any such housing, the owner of such housing may petition the National Housing Agency, in accordance with NHA General Order No. 60-3, to permit such housing to be disposed of otherwise than as provided above in this subsection 5.01." See full text of subsection 5.01 quoted in findings. It is thus apparent that contrary to petitioner's contention, assuming arguendo that the regulations governed the dwelling units in question, there could have been sales of these homes under the National Housing Agency regulations. But regardless of the provisions of the regulations the evidence justifies our finding that the property in question was in actuality held primarily for sale. Issue 2. As pointed out in our findings petitioners did not include $600 owing on the note secured by the second deed of trust at the end of the taxable year contending that at the time of sale of the dwelling unit in question the note had no fair market value. The respondent determined contrariwise holding that the note had a fair market value of $1,185.84 on the date of sale. See Regulations 111, section 29.44-4. Therefore under the respondent's determination *19 the $585.84 which was paid on that note plus the $600 remaining unpaid at the end of the year are includible in petitioner's income for the year involved. Petitioner, at the hearing, attempted by expert testimony to prove that the note secured by the second deed of trust had no market value on the date of sale. It developed that the witness was not qualified to testify with respect to this question; hence, his testimony was not competent evidence in support of petitioner's argument. He attempted to produce no additional evidence. He has failed, therefore, to sustain his burden and the respondent must prevail on this issue. Petitioner also argues that the note in this sale was treated differently by respondent from those in the other sales, concluding that there was not justification for so doing. Respondent, however, was fully justified in his action for as we have pointed out in the facts the transaction involved was a deferred payment type of sale. That sale did not qualify as an installment sale as the others did because the initial payment exceeded 30 per cent of the selling price. See section 44 (b) of the Code. Issue 3. Petitioners contend that they are entitled to deduct *20 the amounts accruable for California state income taxes in computing their victory tax net income for the year involved. Both parties agree that with respect to this issue, Anna Harris, 10 T.C. 818, reversed and remanded on another issue by the United States Court of Appeals for the Ninth Circuit, Fed. (2d) (July 7, 1949) is controlling. Under the rationale of that case respondent's position must be sustained. We see no reason for changing our position with respect to this issue here. It follows that respondent did not err in his determination. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.↩